FILED

09/24/2024

Clerk of the
Appellate Courts

IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
October 24, 2023 Session

**STATE OF TENNESSEE v. JOHN M. FLETCHER**

**Appeal from the Criminal Court for Knox County**
**No. 116543   Kyle A. Hixson, Judge**

_____

**No. E2022-01319-CCA-R3-CD**

_____

A Knox County jury convicted the Defendant, John M. Fletcher, of initiating a false report to a law enforcement officer and presenting a false or fraudulent insurance claim. The trial court imposed an effective sentence of four years. On appeal, the Defendant challenges the legal sufficiency of the evidence supporting his convictions. Upon our review, we hold that the evidence is legally sufficient to sustain the Defendant's conviction for presenting a false or fraudulent insurance claim. However, we also conclude that the evidence is insufficient to sustain his conviction for initiating a false report, and we vacate that judgment and remand for dismissal of that charge. We respectfully affirm the judgments of the trial court in all other respects.

**Tenn. R. App. P. 3 Appeal as of Right;**
**Judgments of the Criminal Court Affirmed in Part; Reversed in Part;**
**Case Remanded**

TOM GREENHOLTZ, J., delivered the opinion of the court, in which ROBERT L. HOLLOWAY, JR., and MATTHEW J. WILSON, JJ., joined.

Eric M. Lutton, District Public Defender, and Jonathan Harwell, Assistant District Public Defender, Knoxville, Tennessee (on appeal), and Curtis W. Isabell, Clinton, Tennessee (at trial), for the appellant, John M. Fletcher.

Jonathan Skrmetti, Attorney General and Reporter; Garrett D. Ward, Senior Assistant Attorney General; Charme P. Allen, District Attorney General; and William C. Bright and Sean Roberts, Assistant District Attorneys General, for the appellee, State of Tennessee.

# OPINION

## FACTUAL BACKGROUND

On November 11, 2018, the Defendant purchased a 2006 black Hummer. The Defendant owned several other vehicles and did not have room to park the vehicle at his house. As such, he arranged to park the Hummer at the home of his employee, Heath Metcalf.

On the morning of December 7, 2018, the Defendant asked Mr. Metcalf to pick him up in the Hummer and take him to a lunch meeting in West Knoxville. After Mr. Metcalf drove him to the restaurant, the Defendant instructed Mr. Metcalf to park the Hummer at a nearby apartment complex where one of the Defendant's friends lived. He informed Mr. Metcalf that his Lincoln Aviator was parked across the street from the apartments and instructed Mr. Metcalf to drive the Lincoln home after parking the Hummer.

Shortly after noon that day, the Defendant called the Knoxville Police Department (KPD) to report that his Hummer had been stolen. According to the Defendant's later testimony at trial, no one was available to take the report, and he left a message for a return call.

Meanwhile, the Defendant called Mr. Metcalf and asked Mr. Metcalf to pick him up in the Lincoln. Once inside the Lincoln, the Defendant told Mr. Metcalf that he had reported the Hummer stolen. Mr. Metcalf was "very surprised" by the statement and asked the Defendant what he was supposed to do with the key to the Hummer. The Defendant responded, "I guess you need to throw it away." Mr. Metcalf, who later testified that he feared being implicated in a crime, said nothing to the police until the following March.

The Defendant also contacted his insurance company, Geico, to report the theft, and he asked Mr. Metcalf to drive him to their offices to complete some paperwork. The insurance agent gave the Defendant a "vehicle theft questionnaire," and the Defendant returned this form twelve days later on December 19. On the questionnaire, the Defendant represented that he purchased the Hummer for $8,500, though he later testified at trial that the actual purchase price was $4,500. He also said that he was given only one key when he purchased the Hummer and never had any additional keys made.

While at the insurance company, the Defendant received a call from Cadet Tyriq Campbell with the KPD. The Defendant reported to Cadet Campbell that his Hummer had been stolen from the parking lot of the restaurant and that it had a value of $9,500. After

2

Cadet Campbell finished taking the report, he sent it to his supervisor. Although Cadet Campbell's role in the investigation ended at that point, he issued an alert to officers to be on the lookout for the Hummer, and he entered the SUV into the KPD's record division as being stolen. No other KPD officers spoke with the Defendant.

The Hummer was recovered on December 12 from the Metropolitan Apartments complex, which was about three miles from the restaurant. During Geico's claim investigation, its investigator, James Bowers, examined the vehicle and found no indication of forced entry or that the vehicle had been started in any manner other than by a key. He also noted that all four tires had been punctured and the backseat leather had been slashed.

On October 30, 2019, a Knox County grand jury charged the Defendant with initiating a false report to a law enforcement officer and presenting a false or fraudulent insurance claim.[1] During the trial conducted in May 2022, the State called witnesses to testify to the above facts, including Cadet Campbell, Mr. Metcalf, and two representatives from Geico Insurance Company.

Geico claims adjuster Brent Schreiber explained that the vehicle theft questionnaire was "basically them putting their claim in writing." According to Mr. Schreiber, in the event of an unrecovered theft, the insurance company would "pay out the value of the vehicle less the deductible." If the vehicle were recovered and damaged, an estimate would be prepared and, if approved, paid minus the deductible. The Defendant's deductible was $500.

The State also introduced security videos from a nearby credit union showing the Hummer being driven to and away from the restaurant where the Defendant had lunch. The video evidence showed the Hummer arriving and being parked at 10:57 a.m. on December 7. It then showed a person walking towards the restaurant at 11:07, returning to the car nearly thirty minutes later, and immediately driving the Hummer out of the parking lot. At trial, Mr. Metcalf identified himself as the person on the videos.

The Defendant also testified on his own behalf. He denied making false claims to law enforcement or his insurance company and insisted that his Hummer had been stolen. The Defendant also disputed Mr. Metcalf's interpretation of the video evidence and testified that he was the person actually depicted in the videos.

---

[1] The grand jury also charged the Defendant with extortion. However, the trial court granted a judgment of acquittal after the proof, and the parties raise no further issue with respect to that charge.

At the conclusion of the trial, the jury convicted the Defendant of initiating a false report to a law enforcement officer and presenting a false or fraudulent insurance claim. After a hearing conducted on July 8, 2022, the trial court sentenced the Defendant as a Range I, standard offender to serve concurrent sentences of four years for each of the convictions in the Tennessee Department of Correction.

The Defendant filed a timely motion for a new trial, which the trial court denied on August 26, 2022. He then filed a timely notice of appeal twenty-five days later.

## STANDARD OF APPELLATE REVIEW

Our supreme court has recognized that "the first question for a reviewing court on any issue is 'what is the appropriate standard of review?'" *State v. Enix*, 653 S.W.3d 692, 698 (Tenn. 2022). The issues presented in this case are whether the Defendant's convictions for initiating a false report to a law enforcement officer and presenting a false insurance claim are supported by legally sufficient evidence.

The standard for appellate review of a claim challenging the sufficiency of the State's evidence is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *State v. Miller*, 638 S.W.3d 136, 157 (Tenn. 2021) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). This standard of review is "highly deferential" in favor of the jury's verdict. *See State v. Lyons*, 669 S.W.3d 775, 791 (Tenn. 2023). Indeed, "[w]hen making that determination, the prosecution is afforded the strongest legitimate view of the evidence as well as all reasonable and legitimate inferences which may be drawn therefrom." *State v. Thomas*, 687 S.W.3d 223, 249 (Tenn. 2024) (citation and internal quotation marks omitted). To that end, "[w]e do not reweigh the evidence, because questions regarding witness credibility, the weight to be given the evidence, and factual issues raised by the evidence are resolved by the jury, as the trier of fact." *State v. Shackleford*, 673 S.W.3d 243, 250 (Tenn. 2023) (citations omitted). "The standard of review is the same whether the conviction is based upon direct or circumstantial evidence." *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (citation and internal quotation marks omitted).

We pause to note one aspect of the standard of appellate review. In his brief, the Defendant argues that "[a]bsent [his] testimony, there was no proof that the crimes alleged (false report, insurance fraud) actually occurred." In so arguing, the Defendant appears to assert that the proof is insufficient, in part, because the State failed to prove the charges during its case-in-chief and instead relied on his testimony to establish his guilt.

4

As we discuss below, we respectfully disagree that the Defendant's testimony is the only proof that he committed the charged crimes. Nevertheless, this is a case in which the Defendant chose to present proof after his mid-trial motion for acquittal was denied. As such, in reviewing the legal sufficiency of the convicting evidence, this court may consider *all* of the proof presented at trial that supports the jury's verdict, including that presented by the Defendant. *See State v. Gilley*, 297 S.W.3d 739, 763 (Tenn. Crim. App. 2008) ("[O]ur review of the sufficiency of the evidence is not based solely on the evidence offered during the State's case-in-chief but must also necessarily include the proof offered by the defendant."). To that end, we will review the evidence presented by both the State and the Defendant in evaluating the Defendant's issues.

## ANALYSIS

On appeal, the Defendant raises several challenges to the legal sufficiency of the evidence sustaining each conviction. As to both convictions, he argues that his reports regarding the theft of his vehicle were not false and that the explanations he offered to the jury were more logical and compelling than the State's. He also argues that Mr. Metcalf's testimony should not be considered because he was an accomplice whose testimony was not corroborated by independent evidence. Concerning his conviction for initiating a false police report, the Defendant further asserts that the State failed to prove that Cadet Campbell was a "law enforcement officer" as the false reporting statute requires. And as to his conviction for presenting a false or fraudulent insurance claim, the Defendant maintains that the State failed to prove that (1) he presented a claim on the date alleged in the indictment; (2) his claim was false or fraudulent; or (3) his claim had any value given that he did not receive payment from the insurance company.

We address each of these issues in turn.

### A.    INITIATING A FALSE REPORT TO A LAW ENFORCEMENT OFFICER

We first address whether the evidence is legally sufficient to support the Defendant's conviction for initiating a false report to a law enforcement officer. In relevant part, Tennessee Code Annotated section 39-16-502 provides as follows:

(a)    It is unlawful for any person to:

5

> (1) Initiate a report or statement to a law enforcement officer concerning an offense or incident within the officer's concern knowing that:
>
> (A) The offense or incident reported did not occur[.]

The Defendant first argues that the State failed to prove an essential element of the offense because it introduced no proof about what a "cadet" is. Specifically, the Defendant maintains that the State failed to establish that a cadet had "a duty imposed by law" to engage in either "maintaining public order" or "in arresting and investigating." The State responds that the duties described by the cadet at trial establish that he was a "law enforcement officer" as defined by statute. It also argues that the Defendant's conviction may be sustained because he "initiated" a report that ultimately reached a law enforcement officer. We agree with the Defendant, though our opinion is limited in scope, as we discuss below.

## 1. Police Cadet as a Law Enforcement Officer

Before criminal liability may attach, the false reports statute requires that a defendant initiate a report "to a law enforcement officer." Tenn. Code Ann. § 39-16-502(a)(1) (2018). As such, in determining the sufficiency of the evidence, we must first "determine whether any rational trier of fact, if given the complete and accurate statutory definition, could have found beyond a reasonable doubt" that Cadet Campbell was a "law enforcement officer." *State v. Pope*, 427 S.W.3d 363, 370 (Tenn. 2013).

The term "law enforcement officer" is a statutory term, which our General Assembly has defined as being

> an officer, employee or agent of government who has a duty imposed by law to:
>
> (i) Maintain public order; or
>
> (ii) Make arrests for offenses, whether that duty extends to all offenses or is limited to specific offenses; and

6

> > (iii)    Investigate the commission or suspected commission of offenses[.]

Tenn. Code Ann. § 39-11-106(a)(24)(A) (Supp. 2021).  Thus, as can be seen from the plain language of the statute, the definition of a "law enforcement officer" has three statutory components: (1) the person must be an officer, employee or agent of government; (2) the person must have a duty to maintain public order, make arrests, or investigate crimes; and (3) these duties must have been imposed on the person by law.

At trial, the State asked Cadet Campbell briefly about his employment and duties as a cadet with the KPD.  In the only testimony at trial on these topics, the two questions and answers were as follows:

> Q.    [State's Lawyer] And what was your employment around December of 2018?

> A.    [Cadet Campbell] At that time I was a cadet with the Knoxville Police Department.

> Q.    And during your time as a cadet in December of 2018, what kind of things were you doing for KPD?

> A.    At the time I was either writing parking tickets or in the Teleserve unit or helping our property . . . crimes unit.

The State did not otherwise seek to establish what type of position a KPD cadet holds, what authority or duties a cadet has, or from what source a cadet's authority derives.  Cadet Campbell did not further describe his duties or work in these areas.  He did not explain what it meant to "help" with the property crimes unit, and the record does not reveal what KPD's Teleserve unit is, though the cadet testified that he was working in that unit when he received the Defendant's report.

Taking this brief testimony in a light most favorable to the State, a rational juror could find that Cadet Campbell was an *employee* of a government.  However, no party offered the jury any evidence defining the duties of a KPD cadet "imposed by law."  For example, the parties did not cite or discuss whether a cadet's duties and authorities are established or defined by any provision of the Tennessee Code Annotated, the Knoxville

7

City Charter, the Knoxville Code of Ordinances, or the General Orders of the Knoxville Police Department.[2] Moreover, because the State did not establish that a cadet is the same as a sworn officer, the jury could not simply infer this authority by virtue of his status as a cadet.

The State could have established Cadet Campbell's status as a "law enforcement officer" simply by asking about the cadet program or inquiring about the source of his authority, whether that authority derived from the city charter, code of ordinances, state law, or otherwise. In fact, the State has done so in other cases when the law requires proof that a "law enforcement officer" was involved. *See State v. Calvera*, No. E2018-00982-CCA-R3-CD, 2019 WL 1858297, at *3 (Tenn. Crim. App. Apr. 25, 2019) (finding that a deputy sheriff corrections officer was a law enforcement officer based on statutory authority and trial testimony about deputy's actual duties as maintaining public order). However, the State did not do so here, and the record is entirely silent on this point.

Instead, it appears that the State largely relied on Cadet Campbell's employment with the KPD to establish that he was a "law enforcement officer." Unfortunately for the State, however, the mere fact of employment with a municipal police department does not establish one as a law enforcement officer. Indeed, it is not enough to show that the cadet assisted other law enforcement officers in conducting their duties. The plain language of Tennessee Code Annotated section 39-11-106(a)(24)(A) requires that the cadet's duties be imposed by law before he or she is also a "law enforcement officer" as defined by statute.

To be clear, the question is not whether Cadet Campbell actually *was* a "law enforcement officer" in fact; it is whether the State introduced sufficient proof for a rational juror *to find that he was* within the meaning of section 39-11-106(a)(24)(A). We have cautioned that while "the State is entitled to all reasonable inferences from the proof, the jury may not speculate an accused into the penitentiary." *State v. Pack*, 421 S.W.3d 629, 643 (Tenn. Crim. App. 2013). In other words, "a conviction for a criminal offense cannot be predicated solely upon conjecture, guess, speculation, or a mere possibility that he or she may be guilty." *State v. Transou*, 928 S.W.2d 949, 955 (Tenn. Crim. App. 1996). Because no proof showed that the police cadet was a law enforcement officer with duties

---

[2]    While the KPD chief of police can assign officers "to enforce all street traffic laws of the city and all of the state vehicle laws," Knoxville Code of Ordinances § 17-48, no proof at the trial of this case established that Cadet Campbell operated with the authority of the chief of police to enforce street traffic laws. Our own research has not uncovered any such assignment either.

8

imposed by law, we must conclude that the evidence is legally insufficient to establish that the Defendant initiated a false report to a law enforcement officer.[3]

## 2.    "Initiating" a False Report

In the alternative, the State argues that even if the proof did not establish that Cadet Campbell was a law enforcement officer as defined by statute, the Defendant nevertheless "initiated" a report that made its way to other law enforcement officers from the cadet. From this position, the State argues that the proof is sufficient to support the Defendant's conviction.  We again respectfully disagree.

The State's argument effectively imposes criminal liability for a false report made to a person employed by a law enforcement *agency*, rather than to a law enforcement *officer*.  This position may have merit as a matter of public policy, but the statute's plain language does not extend this far.   Section 39-16-502(a)(1) prohibits a person from initiating a false report "to" a law enforcement officer about "an offense or incident within the officer's concern."   Because the defendant must make the false report "to" a law enforcement officer, the recipient of the report from the defendant must be a law enforcement officer and not merely someone who later forwards a report to an officer.  This conclusion is reinforced by the requirement that the report must be about an offense "within the officer's concern," again referring to the officer as an individual.  Because the statute does not contemplate liability for a false report made to a non-law enforcement employee of a law enforcement agency, it necessarily does not contemplate a situation where the defendant sets off a chain reaction of reporting that ultimately makes it to a law enforcement officer.

To counter the statute's plain language, the State cites *State v. Montgomery*, No. M2019-00757-CCA-R3-CD, 2020 WL 2844531 (Tenn. Crim. App. June 1, 2020), *perm. app. denied* (Tenn. Sept. 16, 2020) as standing for the proposition that a false report to a 911 dispatcher triggers liability under the statute.  In *Montgomery*, the defendant claimed that he was robbed, and he reported the robbery to the hotel clerk, who then called 911. Shortly after that, Officer Wilkinson and a police sergeant arrived, and the defendant gave multiple statements to each of them concerning the alleged robbery.  *See id.* at *1-2.  On

---

[3]    Pursuant to an order for supplemental briefing, the Defendant also argues that the trial court "committed plain error in failing to instruct the jury on the definition of a 'law enforcement officer'" when instructing the jury on the offense of making a false report.  However, because we have found that the evidence is insufficient to sustain the Defendant's conviction for making a false report, "any error in the jury instructions is moot and need not be further addressed by this [c]ourt."  *State v. Jackson*, 124 S.W.3d 139, 146 (Tenn. Crim. App. 2003).

appeal, we affirmed the defendant's conviction for initiating a false report to a law enforcement officer. *See id.* at *7.

Importantly, *Montgomery* was not a case in which we affirmed a conviction for initiating a report to a hotel clerk that eventually made its way to the investigating officer. Instead, the indictment in *Montgomery* charged that the defendant made a false report directly to Officer Wilkinson. *Id.* at *2. Thus, *Montgomery* stands for the unremarkable proposition that when a defendant makes a false report to a law enforcement officer, even after making a similar report to non-law enforcement persons, the defendant may be subject to criminal liability under section 39-16-502(a)(1).[4]

However, in this case, no evidence shows that the Defendant ever spoke with a law enforcement officer after he spoke with Cadet Campbell. On the contrary, the cadet testified that after he spoke with the Defendant, he completed the report and sent it to his supervisor. There was no further testimony from another law enforcement officer, including the cadet's supervisor, that they later spoke with the Defendant and received the same false report from him. In other words, the only person to whom the Defendant made a false report was someone who was not established as a law enforcement officer as defined by the statute.

### 3.    Limited Nature of the Holding

We must conclude that the proof is not legally sufficient to establish that the Defendant initiated a false report to a law enforcement officer. However, we pause to emphasize the limited nature of our holding and offer three observations.

First, in most cases where the State calls a sworn member of law enforcement to testify, a jury will be able to reasonably infer from the nature and description of the officer's duties that the duties to maintain public order are imposed by law. The distinction here is that the scope and sources of a police cadet's duties are not intuitive.

---

[4]    We acknowledge that the supreme court has upheld a conviction for initiating a false report when the report was made to a police dispatcher employed by a municipal police department. *See State v. Smith*, 436 S.W.3d 751, 770-71 (Tenn. 2014). However, the issue of whether the dispatcher was "a law enforcement officer" does not appear to have been a contested issue. Instead, the issue in *Smith* related to when a false report is "initiated." After finding that a report had been "initiated" to this law enforcement officer, the court reasoned that the defendant did not "initiate" a report again by repeating the same false claim to other law enforcement officers. *See id.* at 771-72. *Smith* did not analyze the statutory definition of "a law enforcement officer" or speak to situations in which the false report is first made to a non-law enforcement employee or person. Our decision in *Montgomery* addresses this situation, however.

10

The parties have not cited any legal authority establishing the duties of a KPD Cadet. We have undertaken our own examination of the Tennessee Code Annotated, the Knoxville City Charter, the Knoxville Code of Ordinances, and the General Orders of the Knoxville Police Department, as well as opinions authored by the Attorney General and Reporter. In these sources of law, we have been unable to find any hint about what a cadet is or the legal sources or scope of a cadet's authority within the KPD.

The parties have instead resorted to conflicting descriptions of the cadet program and their duties found on various websites published by the City of Knoxville and KPD. The websites describe a cadet's activities, such as conducting bicycle patrols and parking enforcement. Yet these websites are also careful to explain that the cadet program is "an alternative" for those "who are not old enough to be employed as Police Officers, yet wish to pursue a career in Law Enforcement." They also repeatedly make clear that cadets handle, or are employed in, "non-enforcement activities" while participating in this program.[5]

None of these descriptions was offered to the jury, and as such, we do not consider them in our analysis here. However, the parties' reliance on conflicting website descriptions instead of traditional sources of law serves to prove the point: reasonable inferences cannot be drawn about *this* cadet's duties simply by virtue of his employment. In this limited case, at least some proof was required to show what a cadet's duties are, from where they are derived, and how the nature of the report was "within the [cadet's] concern."

Second, the scenario in this case is unlikely to arise frequently. In the overwhelming number of cases where a non-law-enforcement person or employee is involved, the person who receives the false report will refer the defendant to a law enforcement officer. A defendant who initiates the false report to that officer cannot be absolved of criminal liability simply because he or she spoke to a non-law enforcement person first. *See Montgomery*, 2020 WL 2844531, at *2. Unlike the typical circumstance, the Defendant here made a report to a person whose duties imposed by law were undefined at trial, but he did not speak later to any other law enforcement officer about the report. Although we expect that this particular factual scenario is especially rare, we emphasize the need for additional proof regarding the cadet's duties if this scenario should ever arise again.

Third, and most importantly: We understand the critical legislative policy considerations in preserving law enforcement resources and safety against false reports.

---

[5] *See* https://knoxvilletnpolice.gov/cadet-program/; https://joinknoxpd.com/cadet/; https://www.knoxvilletn.gov/government/city_departments_offices/police_department/field_operations_bureau/cadet_program (each last visited on September 20, 2024).

*See* Tenn. Code Ann. § 39-16-502, Sent. Comm. Cmts.  Nothing in this opinion seeks to undermine those policies at all.  We hold only that where reasonable inferences cannot be drawn about a person's law enforcement duties imposed by law, the jury may require additional proof to support the essential elements required by the legislature.

Accordingly, we respectfully vacate the judgment of conviction and dismiss the charge.  *See State v. Parker*, 350 S.W.3d 883, 909 (Tenn. 2011) ("[A] court reviewing the sufficiency of the evidence must determine whether each element of the conviction offense is supported by sufficient proof.  If the proof does not adequately support each and every element, the defendant is entitled to a reversal of the conviction.").

## B.      FALSE OR FRAUDULENT INSURANCE CLAIM

The Defendant next argues that the evidence is not legally sufficient to sustain his conviction for presenting a false or fraudulent insurance claim.  He challenges the proof supporting the date of the offense, asserting that the State failed to show that he made a false insurance claim for the theft of his vehicle on December 15, 2018, which was the date alleged in the indictment.  Instead, he maintains that the claim he submitted on that day was for damage to his vehicle, and not its theft, and was therefore not false.  In response, the State argues that the date of the claim is not an essential element of the offense.  It also asserts the proof shows that the Defendant falsely reported to his insurance company that his car had been stolen and that he did so to obtain payment.  We agree with the State.

### 1.      Date of the False Claim

The Defendant first asserts that the State failed to prove that he made a false claim on the date alleged in the indictment, December 15, 2018.  He argues that because the indictment alleges a specific date on which the claim was made, his conviction may not be sustained by proof that he contacted the insurance company a week earlier on December 7.  The State responds that the date of the claim is not an essential element of the crime and that the grand jury's allegation that the Defendant committed his offense "[o]n or about the 15th day of December, 2018" covers the entire period from December 7 through December 19.  We agree with the State.

At one time, Tennessee common law held that an offense must be proved "exactly as described in the indictment," even if the description was more than was required by the statute creating the crime.  *Bolton v. State*, 617 S.W.2d 909, 910 (Tenn. Crim. App. 1981) (cited in *State v. March*, 293 S.W.3d 576, 588 (Tenn. Crim. App. 2008)).  However, some forty years ago, the supreme court recognized that this common law rule "has been relaxed

in modern times so that substance rather than form is now determinative of such questions." *State v. Moss*, 662 S.W.2d 590, 592 (Tenn. 1984). This approach "is consistent with the test of an indictment's sufficiency[,] which is the adequacy of the notice to the defendant conveyed by its terms." *State v. Mayes*, 854 S.W.2d 638, 640 (Tenn. 1993) (citation and internal quotation marks omitted).

Tennessee law is now clear that the essential elements of a crime that must be alleged and proven are those established by a statute. *See March*, 293 S.W.3d at 589. Thus, where a grand jury alleges facts in addition to the essential statutory elements, the additional facts may be disregarded as "surplusage" when two conditions are satisfied: "(1) the indictment otherwise sufficiently informs the defendant of the charge against him such that he will not be misled and can adequately plan a defense[;] and (2) the variance is such that the defendant cannot be prosecuted again for the same offense due to double jeopardy principles." *Mayes*, 854 S.W.2d at 641; *State v. Culp*, 891 S.W.2d 232, 236 (Tenn. Crim. App. 1994) ("If an indictment's surplusage is with respect to a matter legally essential to the charge, then it must be proven to the degree of detail alleged. If it is not essential, then it need not be proven at all."). Where these two concerns are not at issue, surplus terms "cannot enlarge the essential elements of the offense," and they may be "disregarded in analyzing the sufficiency of the convicting evidence." *March*, 293 S.W.3d at 589 (citation omitted).

To that end, unless the date of an offense is "essential to proving the offense or to the imposition of a defense," the State is not required to allege the date that a crime took place in the indictment. *State v. Howse*, 634 S.W.2d 652, 657 (Tenn. Crim. App. 1982). Indeed, this principle is recognized by statute:

> The time at which the offense was committed need not be stated in the indictment, but the offense may be alleged to have been committed on any day before the finding of the indictment, or generally before the finding of the indictment, unless the time is a material ingredient in the offense.

Tenn. Code Ann. § 40-13-207 (2018); *see also State v. Byrd*, 820 S.W.2d 739, 740 (Tenn. 1991) ("The rule of law is well-established in Tennessee that the exact date, or even the year, of an offense need not be stated in an indictment or presentment unless the date or time is a material ingredient in the offense.").

In this case, the presentation of a false insurance claim is prohibited by Tennessee Code Annotated section 39-14-133 (2018), which provides as follows:

Any person who intentionally presents or causes to be presented a false or fraudulent claim, or any proof in support of such claim, for the payment of a loss, or other benefits, upon any contract of insurance coverage, or automobile comprehensive or collision insurance, or certificate of such insurance or prepares, makes or subscribes to a false or fraudulent account, certificate, affidavit or proof of loss, or other documents or writing, with intent that the same may be presented or used in support of such claim, is punished as in the case of theft.

As can be seen from the statute's plain language, the date the defendant presents a false claim is not an essential element of the crime of insurance fraud, and as such, the presentation date is not a matter that is legally essential to the charge. *See also State v. Mitchell*, 592 S.W.3d 431, 437 (Tenn. 2019) (identifying the essential elements of the crime of insurance fraud as being "(1) intentionally; (2) presenting or causing to be presented; (3) a false or fraudulent; (4) claim or any proof in support of such claim; (5) for the payment of a loss or other benefit; (6) upon any contract of insurance coverage."). Instead, if the State alleges a date that a false claim is presented in the indictment, the date "merely serves to describe the offense charged and form[ed] no part of its substance." *Mayes*, 854 S.W.2d at 640 (citations omitted).

Importantly, this is not a case where the alleged date misled the Defendant or otherwise hindered his defense. Instead, his consistent defense at trial was that he did not falsely report to the police or make an insurance claim because he asserted that his vehicle was genuinely stolen. His attorney argued this position during the mid-trial motion for acquittal and in closing arguments. As such, the record shows that the "on or about" date in the indictment did not affect the Defendant's defense or cause a surprise at trial. *See State v. Boyd*, No. M2021-01057-CCA-R3-CD, 2023 WL 2726779, at *13 (Tenn. Crim. App. Mar. 31, 2023), *perm. app. denied* (Tenn. Sept. 12, 2023).

Because the date of the offense in the indictment is properly considered surplusage, we respectfully disagree that the jury was limited to considering the State's proof as to a false insurance claim presented on a single day, December 15. Instead, the jury was free to consider the other proof introduced by the parties at trial, including the Defendant's actions between December 7 and December 19. The Defendant is not entitled to relief on this ground.

14

## 2.    Presentation of a "Claim"

The Defendant next challenges when he presented a "claim" within the meaning of the false insurance claims statute.  He argues that he did not present a "claim" until he returned Geico's vehicle theft questionnaire on December 19, after his vehicle had been "recovered."  From this, he asserts that the claim was only one for the damage to his car and not for its theft.  In response, the State contends that the Defendant's presentation of the theft claim occurred on December 7 and that his submission of the vehicle theft questionnaire on December 19 was merely a continuation of his "pre-existing claim."  We agree with the State.

Our supreme court has acknowledged that "[t]he false or fraudulent insurance claims statute does not define the word 'claim.'"  *Mitchell*, 592 S.W.3d 438.  Moreover, instead of using the term "insurance claim," the statute "uses the much broader term, 'claim.'"  *Id.* at 439.  As such, our supreme court held:

> The statute's clear and unambiguous intent is to criminalize *a person's intentional efforts* to obtain monies under an insurance contract through the presentation of false or fraudulent information to the insurer.  The statute does not require any precise methodology that a person must follow in his efforts to convince an insurance company, through the provision of false or fraudulent information, to pay him money under an insurance policy.  The statute certainly does not criminalize some methodologies and not others based on the technical requirements of different insurance policies.

*Id.* (emphasis added).  In so doing, the supreme court recognized two important principles.  First, verbal representations made to an insurance company, along with other actions, may be sufficient to constitute a "claim" for the purposes of the insurance fraud statute.  *Id.* at 440.  Second, a defendant may present a "claim" even if he or she fails to comply with the terms of the insurance contract for presenting formal claims, such as by filing a proof of loss.  *Id.* at 438.

In this case, the Defendant testified that after his vehicle was "stolen," he called his insurance company on December 7 and "gave them the report over the phone."  He then went to the company's offices and "finished the paperwork with Geico Insurance that [he] had to do that day."  Among the forms that the insurance company gave to the Defendant to complete was the vehicle theft questionnaire, which he returned to Geico on December 19.  This document had a preprinted claim number and noted the "Date of Loss" as being December 7, 2018, both suggesting that Geico believed the Defendant to be presenting a

15

claim. In addition, while at Geico on December 7, the Defendant showed the vehicle's key to the agent in response to a request by the insurance company. As in *Mitchell*, the Defendant presented a claim to his insurance company through his words and actions. Accordingly, we conclude that a rational juror could have found that the Defendant presented a "claim" within the meaning of section 39-14-133 on December 7, 2018.

### 3. The Falsity of the Claim

The Defendant next argues that his actual claim, which he characterizes as being the documents submitted on December 19, was not false. He asserts that by the time he submitted the paperwork on December 19, his vehicle had already been recovered. The Defendant maintains that he was seeking reimbursement for only the damage to the Hummer, that the damage to the vehicle was undisputed, and that the State offered no proof suggesting the Defendant was responsible for the damage to his vehicle. Therefore, any claim for damage to the vehicle could not have been fraudulent. We respectfully disagree.

As we noted above, a rational juror could have found that the Defendant presented an insurance claim on December 7, 2018, related to the theft of his vehicle. Although he contends that the State failed to "introduce any substantive evidence" about what he told the insurance company on December 7, the Defendant himself confirmed that he reported to his insurance company that his vehicle was missing. In addition, he confirmed that he reported the theft of the Hummer to Cadet Campbell while he was at the Geico office completing paperwork, and a reasonable jury could infer that the Defendant made the same representations to both Geico and Cadet Campbell. In addition, the insurance company understood that the Defendant's claim was related to the theft of his vehicle. Mr. Bowers from Geico later testified that the claim resulted from "a theft," and the company asked the Defendant to complete a vehicle theft questionnaire.[6] From this evidence, both direct and circumstantial, a reasonable jury could conclude that the Defendant presented a claim to his insurance company involving the theft of his vehicle.

Moreover, a rational juror could have concluded that this theft claim was false because the Defendant's vehicle had not been stolen. In addition to Mr. Metcalf's testimony establishing that the vehicle was not stolen, the Defendant's vehicle was found with no signs of forced entry, including broken windows, damaged locks, or any tampering with the ignition. The Geico insurance investigator testified that he would have expected signs of forced entry and tampering with the ignition if someone stole the vehicle without

---

[6] In our view, the "discovery" of the vehicle before the claim could be paid is of no moment. As we noted above, a reasonable jury could have found that the offense of presenting a false or fraudulent insurance claim was already complete at the time the Hummer was recovered.

16

a key. Indeed, the investigator could not determine how the car could have been started without the key. As such, a reasonable jury could have inferred that whoever moved the vehicle had the key the Defendant claimed was always in his possession.[7]

In his brief, the Defendant asserts that video evidence is inconsistent with Mr. Metcalf's testimony. He argues that despite Mr. Metcalf's testimony that he drove the Defendant to the restaurant, the video showed only one person in the Hummer when it arrived in the parking lot and showed a person walking toward the restaurant. The Defendant also insists that the person walking toward the restaurant matches his body type. In response, the State disagrees and asserts that the proof is consistent with Mr. Metcalf's testimony that he is the person depicted in the video.

Our supreme court has cautioned "that the power to disregard oral testimony because of its inherent lack of believability is one that should be used sparingly. Only when the testimony is inherently improbable and impossible of belief should courts intervene to declare it incredible as a matter of law." *State v. Hornsby*, 858 S.W.2d 892, 895 (Tenn. 1993). "When the testimony is capable of different interpretations, the matter should be left for the jury to decide as the sole arbiter of credibility." *State v. Dotson*, 450 S.W.3d 1, 88 (Tenn. 2014) (internal quotation marks and citation omitted). "The determination of whether there are inconsistencies in testimony, the reconciliation of conflicts in testimony, and the determination of how this might affect a witness's credibility, are within the province of the jury." *Id.*

In this case, the video is grainy, but nothing about the proof at trial made Mr. Metcalf's testimony inherently unbelievable on its face. As the trier of fact, the jury had the opportunity to evaluate the testimony of both him and the Defendant and to examine and compare the video evidence during deliberations. *See Shackleford*, 673 S.W.3d at 250 ("We do not reweigh the evidence because questions regarding witness credibility, the weight to be given the evidence, and factual issues raised by the evidence are resolved by the jury, as the trier of fact." (citations omitted)). The Defendant's arguments essentially invite us to reweigh the evidence on appeal. We respectfully decline to do so.

Ultimately, the Defendant acknowledged that he contacted his insurance company to report the theft of his Hummer, and he asked Mr. Metcalf to take him to the insurance company's offices to complete the necessary paperwork, including the vehicle theft questionnaire. While at the insurance company's offices, he also reported to Cadet

---

[7] In his brief, the Defendant argues that there is a "plausible explanation" about how the vehicle could have been moved if the Defendant always had the only key: Mr. Metcalf made an extra copy of the key and did not tell the Defendant. However, the Defendant cites no evidence in the record to support this theory.

Campbell that his vehicle had been stolen. From this proof, a rational juror could have inferred that the Defendant's initial claim sought reimbursement for the total value of his vehicle. *See State v. Gibson*, 506 S.W.3d 450, 458 (Tenn. 2016) ("[T]he jury decides the weight to be given to the evidence, the inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence."). A rational juror could also find that the Defendant's vehicle had not been stolen and that the Defendant's claim of theft was false. *See Mitchell*, 592 S.W.3d at 437. We conclude that the evidence is sufficient to sustain the Defendant's conviction for presenting a false or fraudulent insurance claim.

### 4.     Value of the Claim

Finally, the Defendant argues that the evidence is legally insufficient to establish the value of the fraudulent claim.[8] More specifically, the Defendant observes that the statute punishes insurance fraud "as in the case of theft." He further notes that theft is punished based on the value of the property or services obtained, such that any property stolen with a value of less than $1,000 is punished as a Class A misdemeanor. From these premises, he argues that because he obtained no money from his false claim, his crime can be punished only as a Class A misdemeanor, "as in the case of theft." In response, the State argues that the "value" in an insurance fraud claim is the value of the fraudulent claim, not the value of property obtained, if any. We agree with the State.

Tennessee Code Annotated section 39-14-133 provides that presenting a false or fraudulent insurance claim "is punished as in the case of theft." In a theft case, the value of the stolen property is important because it determines the class or grade for the theft offense and thus determines its punishment. *State v. Jones*, 589 S.W.3d 747, 756 (Tenn. 2019). For example, if the value of the stolen property or services "is two thousand five hundred dollars ($2,500) or more but less than ten thousand dollars ($10,000)," the theft crime is punished as a Class D felony offense. *See* Tenn. Code Ann. § 39-14-105(a)(3) (2018). Similarly, if the value of the stolen property is less than $1,000 or less, or its value

---

[8]     We note that in *State v. Menke*, 590 S.W.3d 455, 464 (Tenn. 2019), our supreme court held that value establishes an offense class and thereby helps establish an offender's sentencing range. Further, while a jury must establish the value of stolen property, or in the case of filing a false or fraudulent claim, the value of the claim, the value is not an *essential element* of the offense. *Id.* at 468. That is to say, "the inability to ascertain . . . value is not fatal to the State's charge against the defendant." *Id.*; *see* Tenn. Code Ann. § 39-11-106(a)(39)(C) ("If property or service has value that cannot be ascertained by the criteria set forth in subdivisions (a)(39)(A) and (B), the property or service is deemed to have a value of less than fifty dollars ($50.00)[.]").

cannot be ascertained, the crime is punished as a Class A misdemeanor. *Id.* §§ 39-14-105(a)(1); 39-11-106(a)(39)(C).

However, we respectfully disagree with the Defendant that the insurance fraud statute can be read to link its punishment to the "obtaining" of property, like theft. "In interpreting statutory provisions, our role is to determine how a reasonable reader would have understood the text at the time it was enacted." *Lawson v. Hawkins County*, 661 S.W.3d 54, 59 (Tenn. 2023). In addition, a court should "consider the whole text of a statute and interpret each word so that no part will be inoperative, superfluous, void or insignificant." *State v. Deberry*, 651 S.W.3d 918, 924-25 (Tenn. 2022) (citation and internal quotation marks omitted). A court must "also consider the overall statutory framework." *Id.* (citation, alteration, and internal quotation marks omitted).

Examining the theft and insurance fraud statutes shows that the Defendant's argument is without merit. The statute criminalizing theft of property requires the State to prove that a defendant obtained or exercised control over the property without the owner's effective consent. *See* Tenn. Code Ann. § 39-14-103(a) (2018). The corresponding statute that punishes theft crimes references these essential elements and grades the punishment on "the value of the property or services obtained." *See id.* § 39-14-105(a)(1)-(6).

In contrast, the insurance fraud statute does not criminalize one's "obtaining" payment as a result of a false claim. Instead, the law punishes one's intentional *presenting of a claim* for payment. *See* Tenn. Code Ann. § 39-14-133; *Mitchell*, 592 S.W.3d at 439 ("The statute's clear and unambiguous intent is to criminalize a person's intentional efforts to obtain monies under an insurance contract through the presentation of false or fraudulent information to the insurer."). Unlike the theft statutes, the essential elements of the crime of insurance fraud do not require proof that a defendant obtained any money from presenting the false claim. *See Mitchell*, 592 S.W.3d at 437 (identifying elements). Indeed, the insurance fraud statute does not even use the term "obtain" or other words of similar import.

Therefore, section 39-14-133 does not require a defendant to "obtain" money before criminal liability may attach. As such, a reasonable reader would not understand that the crime is punished based on the value of the money "obtained," as do the theft statutes. Instead, a reasonable reader would expect the punishment for insurance fraud to correspond to the conduct that is actually criminalized. Thus, when the insurance fraud statute refers to punishment "as in the case of theft," it can only mean that the false claim itself—the conduct being criminalized—is subject to increasingly harsher penalties as its value increases. As a result, if a defendant intentionally submits a false insurance claim valued between $2,500 and $10,000, the crime is punished as a Class D felony, regardless of

19

whether the defendant actually received less money or no money at all. As with all crimes where value is necessary to determine punishment, the State must prove the value of the claim to the jury beyond a reasonable doubt. *See* Tenn. Code Ann. § 39-11-115 (2018).

This interpretation is consistent with the supreme court's application of the insurance fraud statute. In *State v. Mitchell*, the defendant made a false insurance claim in connection with the arson of a house. Recognizing that the statute criminalizes "efforts" to obtain money through the false insurance claim, the supreme court affirmed the conviction under section 39-14-133 based on the amount of the claim itself, which was between $10,000 and $60,000. Although the defendant successfully obtained a partial payment of $1,000 on his false claim, the amount of money he actually received was irrelevant to establishing the offense class and punishment. *See Mitchell*, 592 S.W.3d at 439.

Our interpretation is also consistent with how we have interpreted statutes that contain similar language, such as those prohibiting forgery and criminal simulation. Each of those statutes provides that the respective offenses are "punishable as theft pursuant to § 39-14-105, but in no event shall . . . be less than a Class E felony." Tenn. Code Ann. §§ 39-14-114(c) (2018); 39-14-115(b) (2018). As in this case, we have recognized that the "value" determining punishment in those contexts is *not* the value of money "obtained" by the defendant through the criminal act. Instead, we have held that because the essential elements of forgery and criminal simulation do not require that the defendant obtain property or services, "the seriousness of the offense[s] should not depend on the value of the property or services actually received." *State v. Odom*, 64 S.W.3d 370, 374 (Tenn. Crim. App. 2001). As such, when these crimes are "punishable as theft," the reasonable person would understand the statute to "require grading the crimes of forgery and criminal simulation according to the apparent value of the writing or object, using the values set forth in the theft grading statute." *Id.*

Indeed, we note that where the General Assembly has sought to punish fraudulent conduct based on the value of property obtained, it has done so in clear language. For example, Tennessee Code Annotated section 39-14-118 prohibits the fraudulent use of a credit or debit card. In that statute, and similar to the insurance fraud statute, the legislature provided that this fraud offense is "punishable as theft pursuant to § 39-14-105[.]" However, unlike the insurance fraud statute, the legislature added two caveats. First, it specifically graded the punishment on "the amount of property, credit, goods or services *obtained*" by the fraudulent use. Tenn. Code Ann. § 39-14-118(c)(1) (2018) (emphasis added). Second, the legislature recognized the possibility that a defendant may obtain no money from the fraudulent use, and it classified the offense as a Class A misdemeanor in that circumstance. *Id.* § 39-14-118(c)(2).

20

Our supreme court has recognized that "[w]hen one statute contains a given provision, the omission of the same provision from a similar statute is significant to show that a different intention existed." *State v. Welch*, 595 S.W.3d 615, 622 (Tenn. 2020) (citation and internal quotation marks omitted). Because the General Assembly has shown that it knows how to punish fraudulent conduct "as theft" based on the value of any property obtained, its failure to do so in the context of insurance fraud must demonstrate a different intention. As such, we conclude that the punishment for the Defendant's insurance fraud offense is graded on the value of the claim as set forth in the theft grading statute, not on the value of the money or property he obtained as a result of that claim.

In this case, the proof at trial revealed that by filing a theft claim, the Defendant sought reimbursement for the value of his vehicle, minus the deductible. The record reveals that his deductible was $500. The Defendant claimed that the value of his vehicle was $8,500. Because a reasonable juror could find beyond a reasonable doubt that the value of the Defendant's false insurance claim was at least $2,500 but less than $10,000, we conclude that the proof is legally sufficient to support the jury's finding on the claim's value. *See* Tenn. Code Ann. § 39-14-105(a)(3). The Defendant is not entitled to relief on this ground.

## C. CORROBORATION OF ACCOMPLICE TESTIMONY

Finally, the Defendant argues that neither of his convictions can be sustained because Mr. Metcalf was an accomplice and his testimony was not corroborated by independent evidence.[9] At trial, the court submitted to the jury the question of whether Mr. Metcalf was an accomplice and instructed the jury that it could not convict the Defendant on Mr. Metcalf's testimony alone unless "other evidence must independently lead to the conclusion that a crime was committed and that the defendant was involved in it."

At the time of the Defendant's crimes, our law provided that "evidence is insufficient to sustain a conviction when the conviction is solely based upon the

---

[9]  Our supreme court has abrogated or abolished the accomplice-corroboration rule for all cases tried after March 18, 2024. *See State v. Thomas*, 687 S.W.3d 223, 245 (Tenn. 2024) ("[I]n the interest of fairness, we will apply the common law accomplice-corroboration rule to Ms. Turner's case, but the rule will be abolished in its current form going forward and that change shall be applied to all trials commencing after the date of the mandate [issued on March 18, 2024]."). This means that a jury may evaluate the testimony of an accomplice as it does with other witnesses and may "convict upon this testimony alone" if it is "convinced beyond a reasonable doubt that [the accomplice's testimony] is true." *Id.* at 248. However, for cases tried before March 18, 2024, the law continues to provide that a conviction may not be "solely based upon the uncorroborated testimony of one or more accomplices." *See State v. Collier*, 411 S.W.3d 886, 894 (Tenn. 2013).

uncorroborated testimony of one or more accomplices." *State v. Thomas*, 687 S.W.3d 223, 239 (Tenn. 2024) (citations omitted). As our supreme court has recently described the accomplice-corroboration rule,

> [T]here must be some fact testified to, entirely independent of the accomplice's testimony, which, taken by itself, leads to the inference, not only that a crime has been committed, but also that the defendant is implicated in it; and this independent corroborative testimony must also include some fact establishing the defendant's identity. This corroborative evidence may be direct or entirely circumstantial, and it need not be adequate, in and of itself, to support a conviction; it is sufficient to meet the requirements of the rule if it fairly and legitimately tends to connect the defendant with the commission of the crime charged. It is not necessary that the corroboration extend to every part of the accomplice's evidence. The corroboration need not be conclusive, but it is sufficient if this evidence, of itself, tends to connect the defendant with the commission of the offense, although the evidence is slight and entitled, when standing alone, to but little consideration.

*Thomas*, 687 S.W.3d at 240 (quoting *State v. Bigbee*, 885 S.W.2d 797, 803 (Tenn. 1994)).

The law defines an accomplice as "one who knowingly, voluntarily, and with common intent participates with the principal offender in the commission of a crime." *Thomas*, 687 S.W.3d at 239 (quoting *State v. Bough*, 152 S.W.3d 453, 464 (Tenn. 2004)). "A witness qualifies as an accomplice if that witness could be indicted for the same offense charged against the defendant." *Id.* at 239-40 (citation and internal quotation marks omitted). When the facts concerning an individual's involvement in the events of a case are undisputed, whether the individual is an accomplice becomes a question of law subject to de novo review without any presumption of correctness. *State v. Collier*, 411 S.W.3d 886, 894 (Tenn. 2013). However, when the facts "are in dispute or susceptible of an inference that a witness may or may not be an accomplice, it then becomes a question of fact for the jury to decide." *State v. Robinson*, 146 S.W.3d 469, 510 (Tenn. 2004) (internal quotation marks and citation omitted).

In this case, we have significant doubt about whether Mr. Metcalf was an accomplice under either party's theory of the case. Nevertheless, we recognize that the trial court, in the proper exercise of its discretion, instructed the jury that it must decide whether Mr. Metcalf was an accomplice and, if so, whether his testimony was sufficiently corroborated. Thus, even if the jury considered Mr. Metcalf to be an accomplice, sufficient evidence existed to corroborate his testimony. For example, law enforcement officers

found the Hummer in the apartment complex parking lot where Mr. Metcalf said he left it. The police found no evidence of forced entry to the Hummer or tampering with the ignition and deduced it was opened and started with a key. The Defendant testified that he had only one key to his Hummer and that he later reported to the insurance company that he still had the vehicle's key in his possession. The Defendant himself also corroborated Mr. Metcalf's testimony that he drove the Defendant to Geico to make a claim based on the missing vehicle.

This direct and circumstantial evidence fairly and legitimately tends to connect the Defendant with the commission of the crimes. As such, we conclude that it is sufficient to provide the required slight corroboration of Mr. Metcalf's testimony. *See State v. Little*, 402 S.W.3d 202, 212 (Tenn. 2013) ("Only slight circumstances are required to furnish the necessary corroboration."), *abrogated by Thomas*, 687 S.W.3d at 242-43. The Defendant is not entitled to relief on these grounds.

## CONCLUSION

In summary, we hold that the evidence is legally sufficient to sustain the Defendant's conviction for presenting a false or fraudulent insurance claim. However, we hold that the evidence is insufficient to sustain the Defendant's conviction for initiating a false report and conclude that any issues about the attendant jury instructions are moot. Accordingly, we vacate the Defendant's judgment of conviction for initiating a false report to a law enforcement officer and remand that charge for dismissal. We respectfully affirm the judgments of the trial court in all other respects.

_____
TOM GREENHOLTZ, JUDGE

23